**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**WESTERN DIVISION**

| | |
|---|---|
| **WILMA ROBERTSON,** | ) |
| | ) |
| **Claimant,** | ) |
| | ) |
| **v.** | )      **CIVIL ACTION NO.** |
| | )      **7:17-CV-01597-KOB** |
| **NANCY BERRYHILL,** | ) |
| **ACTING COMMISSIONER OF** | ) |
| **SOCIAL SECURITY,** | ) |
| | ) |
| **Respondent.** | ) |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

On May 16, 2014, the claimant, Wilma Robertson, applied for disability insurance benefits and Supplemental Security Income on June 23, 2014, alleging that she became disabled on March 11, 2014, because of pain associated with her degenerative disc disease, degenerative joint disease, scoliosis, hypertension, obesity, anemia, epistaxis, bradycardia, and fibroid tumors. (R. 138-39, 142-47). The commissioner denied the claimant's claims on September 2, 2014. (R. 78, 79, 80-84). The claimant timely filed a written request for a hearing before an Administrative Law Judge, and the ALJ held a video hearing on March 2, 2016. (R. 85-86).

In a decision dated July 14, 2016, the ALJ found the claimant was not disabled and was, therefore, ineligible for the requested benefits. (R. 7-26, 37-57). After the claimant requested review of the hearing decision, the Appeals Counsel denied the claimant's request for review on July 27, 2017. (R. 1-6, 134-37). Consequently, the ALJ's July 2016 decision became the final decision of the Commissioner of the Social Security Administration. (R. 1-6). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§

405(g) and 1383(c)(3). For the reasons stated below, this court AFFIRMS the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant presents the following issues for review:

1.  whether the ALJ erred in failing to properly apply the pain standard. Specifically, whether the ALJ failed to take into account any level of pain caused by the ten severe impairments, specifically degenerative disc disease, degenerative joint disease, scoliosis and fibroid tumors;

2.  whether the ALJ erred in failing to link the residual functional capacity to the evidence; and

3.  whether the ALJ failed to fully and fairly develop the record by failing to obtain the opinion of a treating, examining or non-examining physician regarding Ms. Robertson's functional capacity.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the ALJ's decision if he applied the correct legal standards and if substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

In evaluating pain and other subjective complaints, the Commissioner must consider whether the claimant demonstrated an underlying medical condition, and *either* (1) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

The ALJ may consider the claimant's daily activities in evaluating and discrediting complaints of disabling pain. *Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984).

If the ALJ decides to discredit the claimant's testimony as to her pain, he must articulate explicit and adequate reasons for that decision; failure to articulate reasons for discrediting the claimant's testimony is reversible error. *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995). A reviewing court will not disturb a clearly articulated credibility finding supported by substantial evidence in the record. *Id.* at 1562.

The ALJ must also complete a residual functional capacity ("RFC") assessment of each claimant. The responsibility for determining the claimant's RFC rests with the ALJ. 20 C.F.R. 404.1546(c), 416.946(c). An RFC assessment involves consideration of all relevant evidence in determining the claimant's ability to do work in spite of her impairments. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *see also* 20 C.F.R. 404.1545(a), 416.945(a). However, the ALJ's decision does not have to reference every specific piece of evidence that the ALJ evaluated, as long as the decision shows that he considered the claimant's medical condition as a whole. *Castel v. Comm'r of Soc. Sec.*, 355 F. App'x 260, 263 (11th Cir. 2009).

The ALJ must first assess the claimant's functional limitations and restrictions and then express his functional limitations in terms of exertional levels. *See Castel v. Comm'r of Soc. Sec.*, 355 F. App'x 260, 263 (11th Cir.2009); *Freeman v. Barnhart,* 220 F. App'x 957, 959–60 (11th Cir.2007); *see also Bailey v. Astrue,* 5:11–CV–3583–LSC, 2013 WL 531075 (N.D. Ala. Feb. 11, 2013). The ALJ determines the claimant's RFC only after establishing the extent of the claimant's severe impairments. 20 C.F.R. 404.1520(e)-(f), 416.920(e)-(f).

Additionally, the ALJ has a basic obligation to develop a full and fair record. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003); *Graham*, 129 F.3d at 1422. Developing a full

and fair record "may not require use of expert-testimony." *Welch v. Bowen*, 854 F.2d 436, 440 (11th Cir. 1988). "The failure to include [an RFC assessment from a medical source] at the State agency level does not render the ALJ's RFC assessment invalid." *Langley v. Astrue*, 777 F. Supp.2d 1250, 1261 (N.D. Ala. 2011). Furthermore, "the ALJ's duty to develop the record [does not] take away the claimant's burden of proving he is disabled." *Ellison*, 355 F.3d at 1276. A full and fair record ensures that the ALJ has fulfilled his duty to explore the relevant facts and enables the reviewing court to "determine whether the ultimate decision on the merits is rational and supported by substantial evidence." *Id.*

## V. FACTS

The claimant was fifty-six years old with a tenth grade education when the ALJ rendered his decision. (R. 22, 138). The claimant reported that she was disabled because of pain associated with her degenerative disc disease, degenerative joint disease, scoliosis, hypertension, obesity, anemia, epistaxis, bradycardia, and fibroid tumors. (R. 173). The claimant had past relevant work experience as a nurse's aide and vehicle processor. (R. 54, 174). The claimant alleged she was disabled beginning March 11, 2014. (R. 41, 173).

*Physical Impairments*

The claimant visited the emergency room at DCH Regional Medical Center on April 3, 2013, complaining of vaginal bleeding. The claimant reported that her last normal menstrual cycle was 3 years prior. The claimant told ER staff that she noticed continuous spotting for two months prior to her visit, but that her bleeding became heavy about one week prior. The claimant reported lightheadedness, shortness of breath, and abdominal cramping, along with hot flashes, occasional night sweats, and mood swings. The claimant denied vaginal dryness, headache,

blurry vision, chest pain, vomiting, and diarrhea. As to her general medical history, the claimant reported hypertension, but denied migraines, blood disorders, and back problems, among others.

Dr. Angelia Woodward admitted claimant and ordered an ultrasound of the claimant's pelvis, which revealed suspected enlarged fibroid tumors in the claimant's uterus. Over the next two days, doctors performed additional scans, including a chest scan, which revealed no abnormalities, and an ultrasound of the lower extremities that revealed bilateral leg swelling, but no evidence of deep vein thrombosis. On the day of her discharge, April 5, 2013, the claimant reported that she felt better after receiving blood and also reported chronic back pain issues and possible depression. Dr. Abilash Balmuri discharged the claimant with instructions to make an appointment with Capstone Gynecology to follow up on her vaginal bleeding. Dr. Balmuri also started claimant on hormonal therapy. (R. 225-60).

On May 15, 2013, Dr. David Smith of DCH performed an MRI of the claimant's spine after claimant complained of lower back pain. The imaging revealed a normal anatomic alignment in the claimant's lumbar vertebrae, clumped descending nerves, which did not appear to be abnormal; left lateral disc protrusion without evidence of neural impingement; a disc bulge at L4-L5; and a mild annular bulge at L5-S1 without evidence of impingement. (R. 457-58).

The claimant visited the DCH emergency room on July 28, 2013, complaining of lower back pain and pain behind her neck that started one month prior to her visit. The claimant rated her pain as a nine on a ten-point pain scale. Dr. Jeremy Pepper evaluated the claimant, gave her pain medication, and referred her to The Spine Care Center in Tuscaloosa for a follow up visit to determine if she had degenerative disk disease. (R. 437-56).

On August 9, 2013, claimant visited the DCH emergency room complaining of hip pain after "falling up the stairs." The claimant also complained of back pain and reported a history of

back pain. Dr. Christi Vaughn ordered several x-rays, all of which indicated bruising and lumbar strain, but no fractures or dislocation. Dr. Vaughn discharged claimant the same day with instructions to use elevation and compression to allow her bruising to heal. (R. 409-36).

The claimant visited the DCH emergency room again on October 8, 2013, complaining of chest pain. The claimant rated her pain as a seven on a ten-point pain scale. The claimant reported that her pain was tight and sharp, lasted for a few minutes at a time, and was brought on by exertion. The claimant also reported chronic back pain and chronic abdominal pain because of a fibroid tumor for which she was supposed to have surgery. Dr. Robert Sheppard ordered a stress echocardiogram that revealed no abnormality and was negative for ischemia. Dr. Charles Brant reviewed all of claimant's systems and each system was negative for abnormalities. After being admitted to the hospital, the claimant received a transfusion and reported feeling better. Dr. Brant discharged the claimant on October 9, 2013, with recommendations to continue her medications and to follow up with her primary care physician for treatment of iron deficiency. (R. 263-323).

On October 31, 2013, the claimant visited University Medical Center complaining of abnormal bleeding and an abnormal pap smear. Dr. John McDonald reviewed the claimant's systems, which were negative for abnormalities aside from the abnormal pap smear and bleeding. Dr. John McDonald performed an endometrial biopsy and advised claimant to follow up in one week. The laboratory report for this biopsy indicated atypical squamous cells of undetermined significance, benign endometrial polyps, and no indication of HPV. (R. 328-31, 334-38).

On January 3, 2014, the claimant saw Dr. Toya Burton at Whatley Health Services because of back pain. She stated her pain began fifteen years ago, but was improving. After a

review of claimant's systems and a physical exam, Dr. Burton scheduled the claimant for chiropractic manipulation and massage therapy and recommended that the claimant get an update MRI of her back. (R. 922-925).

The claimant visited University Medical Center on January 8, 2014, to follow up on her previously reported abnormal bleeding and an abnormal pap smear. Dr. John McDonald performed a cervical biopsy that indicated no diagnostic histopathologic alteration and benign epithelium, blood, and mucus. (R. 325-27, 332-33).

The claimant sought medical treatment at DCH Regional Medical Center on February 7, 2014, following a motor vehicle accident that occurred the previous day. The claimant complained to Dr. Christi Vaughn of pain from the accident, including low back pain and neck pain. A CT scan of claimant's cervical spine revealed no fractures or subluxation, moderate multilevel degenerative changes, mild posterior disc bulging at C2-C3 and C3-C4, mild posterior spondylotic spurring at C4-C5 with moderate posterior disc bulging centrally to the right, and mild central posterior disc bulge or protrusion at C5-C6. A CT scan of claimant's thoracic spine revealed mild scoliotic curvature, no acute fracture, and appropriate bone density. A CT scan of the claimant's lumbar spine revealed degenerative endplate sclerosis and osteophyte formation at L5-S1. (R. 504-06).

Later that day, claimant checked herself into North Harbor Pavillion, a mental health facility for older adults. The claimant complained to Dr. Sanjay Singh that she was suffering from depression and chronic back pain and reported that her recent car accident had increased her back pain and caused neck pain. She also reported that she had been sleeping poorly because of her pain and that her pain rendered her unable to work. The claimant rated her back pain as a seven on a ten-point pain scale. The claimant told Dr. Singh she felt useless because she can no

longer do the things she used to do and that she heard voices telling her to kill herself, but would never attempt suicide because her sister had attempted suicide. Dr. Singh observed the claimant overnight and recommended that she visit Indian Rivers Mental Health Facility the next week for an evaluation. Dr. Singh discharged the claimant on February 8, 2014. (R. 496-97, 715-739).

The claimant visited Whatley Health Services on February 17, 2014, complaining of back pain. She reported to Dr. Toya Burton that her back pain began around twenty years prior and was worsening. The claimant stated that the pain was in her lower back, legs, neck, and thighs and radiated to her back, ankles, arms, calves, and feet. After a physical exam, Dr. Burton scheduled the claimant for electric stimulation therapy and chiropractic manipulation. (R. 807-09).

On February 20, 2014, the claimant visited Whatley Health Services to follow up on her reported hypertension, back pain, and anemia. The claimant reported to Dr. Aalia Al Barwani that she had not been taking her iron pills because they irritate her stomach and also reported lower back and neck pain. The claimant stated that she had not seen a specialist for her back pain because she wanted to get health insurance first. Dr. Al Barwani recommended a follow-up visit in two weeks. (R. 803-06).

The claimant again visited Whatley Health Services on March 6, 2014, to follow up on her hypertension, back pain, and anemia. Claimant reported to Dr. Aalia Al Barwani that she was experiencing headaches, chest pain, and nausea related to her anemia. Claimant also reported lower back and neck pain, which occurred intermittently. Dr. Al Barwani reviewed claimant's systems and conducted a physical exam, which revealed no abnormalities. Dr. Al Barwani prescribed Neurontin for back pain and advised claimant to visit the emergency room if she experienced chest pain or shortness of breath. (R. 799).

On April 4, 2014, the claimant visited the DCH emergency room complaining of chest pain and shortness of breath. She rated her pain as a six on a ten-point pain scale. Dr. James Proctor performed an EKG that indicated normal sinus rhythm and nonspecific ST changes. Dr. David Smith performed chest x-rays and found no acute findings. Dr. Christi Vaughn also evaluated the claimant, recommending that she follow up with a cardiologist and her primary care physician within one week. Dr. Vaughn discharged the claimant the same day. (R. 373-396).

The claimant returned to the DCH emergency room on April 28, 2014, again complaining of upper chest pain. The claimant rated her pain as a seven on a ten-point pain scale. Dr. James Proctor performed an EK that revealed normal sinus rhythm. Examination notes indicate the claimant respirated with ease and noted no acute distress. The claimant also underwent a lung function spirometry test and received a chest x-ray, both of which noted minor changes in functioning and no significant concerns. Dr. Carson Penkava also evaluated the claimant and determined that she had no atypical cardiac symptoms, but rather that her pain appeared to be musculoskeletal. Dr. Penkava prescribed hydrocodone and ibuprofen and discharged the claimant the same day. (R. 347-72).

On April 10, 2014, the claimant visited Dr. Aalia Al Barwani at Whatley Health Services to follow up on her reports of hypertension, anemia, back pain, nose bleed, and dyspnea. A review of the claimant's systems revealed negative results for chest pain, edema, irregular heartbeat, nausea, polyuria, dizziness, and headache, but positive results for back pain. For her anemia, Dr. Al Barwani instructed the claimant to take over-the-counter iron pills twice daily. For the degeneration of the claimant's lumbar or lumbosacral invertebral disc, Dr. Al Barwani recommended the claimant continue to take Neurontin daily and continue Robaxin only as

needed. Dr. Al Barwani also prescribed an albuterol inhaler to help with the claimant's dyspnea symptoms. (R. 754-57).

Five days later, on April 15, 2014, the claimant again visited Whatley Health services complaining of low back pain and neck pain. The claimant reported her back pain began fifteen years ago and rated her level of pain as a ten on a ten-point pain scale. She characterized her back problems as "fluctuating" and reported that she felt pain in her upper back, lower back, left flank, right flank, arms, legs, neck, and thighs. She reported that her back pain was aggravated by ascending stairs, bending, changing positions, coughing, daily activities, descending stairs, extension, flexion, jumping, lifting, lying/resting, pushing, rolling over in bed, running, sitting, sneezing, standing, twisting, and walking. She denied that anything relieves her pain.

The claimant reported to Dr. Toya Burton that her neck pain began one year ago and characterized her pain as severe and constant. She reported that her pain is bilateral in her head, neck, shoulder, and upper back areas and radiates down her arms. She listed the same aggravating factors for neck pain as she did for her back pain and also denied any relief from the pain. A review of the claimant's systems revealed extreme weakness, loss of balance, numbness in extremities, tingling, back pain, join pain, neck pain, and difficulty sleeping. Dr. Burton's physical exam found that the claimant was having moderate lumbar spasms, lumbar tenderness, and difficulty moving. Dr. Burton recommended massage therapy, electric stimulation, and chiropractic manipulation. (R. 758-61).

The claimant again returned to Whatley Health Services on April 25, 2014, for a medication follow up. Dr. Al Barwani prescribed an inhaler for the claimant on April 5, and the claimant reported to the office to see if the inhaler was working. The claimant reported that she experienced pain with deep inhalation and categorized it as achy in nature. She reported that this

pain began after a biopsy of her right breast in November 2013, and has been worsening since. She also mentioned that an ENT physician inserted "something" in her nose, that it has since fallen out, and that she cannot afford the $150 to follow up at their office. The claimant reported that she was not taking her iron pills as instructed because they were making her sick.

Dr. Al Barwani conducted a physical exam and found the claimant's palpation was normal, that she had no chest wall tenderness, and a regular heart rate and rhythm. Dr. Al Barwani noted an unclear source of the claimant's dyspnea. Dr. Al Barwani ordered a chest x-ray and pulmonary function test and noted that she would refer the claimant to an ENT physician. (R. 762-764).

On June 10, 2014, the claimant visited Tuscaloosa Ear, Nose and Throat to be evaluated for nose bleeds. The claimant told Dr. Lee Loftin that she had been experiencing nose bleeds from her left nostril for about four years. An examination of the claimant's nose revealed a curved septum, enlarged turbinates, clear sinuses, no masses, and no worrisome lesions. The remainder of the claimant's systems were examined and revealed no significant abnormalities. Dr. Loftin performed a catheterization of the claimant's nose and gave her instructions to return as needed for follow-up. (R. 340-44).

Claimant again followed up with Dr. Al Barwani at Whatley Health Services on June 20, 2014, about her hypertension and to report chronic urinary symptoms. Dr. Al Barwani reviewed the claimant's systems and noted chest pain, dyspnea, constipation, incontinence, dizziness, headache, and back, joint, and neck pain.

Dr. Al Barwani further noted the claimant's anemia was still low because claimant was not complaint with her medications and that the chest x-ray ordered on April 25, 2014 showed scarring, which could possibly explain claimant's dyspnea. The claimant reported she was

waiting until November 2014, when she would have insurance, to see a specialist. Dr. Al Barwani noted the claimant still needed pulmonary function tests for her dyspnea and prescribed Ocybutynin for claimant's incontinence. (R. 770-74).

The claimant returned to Whatley Health Services on July 14, 2014, to follow up on her back pain. The claimant reported to Dr. Toya Burton that her back pain began 20 years ago, was moderate to severe, and occurs persistently. She reported the pain was in her lower back and radiated down her legs. Claimant stated that her pain was relieved through heat and massage. Dr. Burton scheduled claimant for massage therapy and chiropractic manipulation. (R. 775-78).

On July 19, 2014, the claimant visited the emergency room at DCH Medical Center complaining of abdominal pain, pain when taking deep breaths, lightheadedness, diarrhea, and nausea. The claimant rated her pain intensity as a six on a ten-point pain scale. Dr. Christina Cooley ordered an ultrasound of the claimant's kidneys, a CT scan of her upper abdomen, and lab work, and determined that the claimant exhibited signs of symptomatic dehydration and orthostatic hypotension, tachycardia, and acute renal failure. Dr. Cooley treated the claimant with a saline IV, released the claimant from the emergency room, and recommended she be admitted to the hospital. After monitoring her condition for a few days, Dr. Ty Krehbiel discharged the claimant on July 22, 2014, after her kidney function improved. (R. 537-85).

On July 25, 2014, the claimant followed up with Whatley Health Services regarding her diarrhea. She reported to Dr. Al Barwani that her diarrhea was improving, but she had only been able to afford her Flagyl prescription and was also able to take 2 Vancomycin tablets. Dr. Al Barwani reviewed the claimant's systems and noted back pain, but no joint pain, dizziness, chest pain, dyspnea, abdominal pain, or urinary frequency. Dr. Al Barwani rewrote the claimant's

prescriptions and advised her to seek financial assistance from Temporary Emergency Services or the Good Samaritan Clinic. (R. 779-83).

On July 28, 2014, Dr. Samuel Williams, a state agency medical consultant, completed a Disability Determination Explanation as to the claimant's alleged impairments. Dr. Williams reviewed the claimant's medical records to date and found, based on the claimant's daily activities and the medical evidence contained in her file, no indication of any mental impairment, no evidence of any medically determinable impairments, and no limitations in basic work activities or functional limitations. (R. 64-65).

The claimant visited the DCH emergency room on August 13, 2014, complaining of diarrhea and nausea and rated her pain intensity as a nine on a ten-point scale. Dr. Neil Stern ordered testing and lab work that revealed mild renal insufficiency. Dr. Stern admitted the claimant to the hospital for further observation. A x-ray of the claimant's abdomen showed no obstructions or free air and no acute disease in the claimant's chest. Dr. David Aymond observed the claimant for several days before releasing her on August 17, 2014, reporting that the claimant was doing very well and no longer having diarrhea. (R. 586-621).

On August 21, 2014, the claimant reported to Whatley Health Services to follow up from her August 13, 2014, hospital visit. The claimant told Dr. Al Barwani that her dentist had given her multiple antibiotic courses and that she believed those antibiotics prompted her diarrhea. A review of the claimant's systems revealed dizziness, dyspnea, and chest pain, but no joint pain. Dr. Al Barwani advised the claimant to continue her Metronidazole tablets for diarrhea, stay hydrated, and continue her iron tablets for anemia. (R. 783-86).

Dr. Al Barwani referred the claimant to DCH on September 30, 2014 for evaluation and treatment of hypotension and bradycardia. The claimant complained to Dr. Carson Penkava of

mild fatigue and intermittent chest pain over the past two years, but reported that she was not experiencing chest pain at that time. The claimant also denied headache, dizziness, melena, abdominal pain, or coughing.

Dr. Warren Holley performed a left heart catheterization on the claimant on October 1, 2014 and found no obstructive coronary artery disease and no significant coronary calcifications. Dr. Holley concluded that the claimant's chest pain was from some other etiology and her shortness of breath was likely secondary to her chronic anemia. The next day, on October 2, 2014, Dr. Elizabeth Marshall cleared the claimant for discharge. (R. 622-71).

The claimant visited Whatley Health Services on October 16, 2014, for a hospital follow up. The claimant reported to Christine Falls, CRNP, that she felt much better and only experienced intermittent chest pain now. The claimant did mention that her vision became blurry shortly after taking her oxybutynin, but that the blurriness went away after four to five hours. CRNP Falls reviewed the claimant's systems and found no abnormalities. (R. 795-98).

On October 21, 2014, the claimant had a follow-up visit with Dr. Warren Holley at Cardiology Associates of West Alabama after her heart catheterization. The claimant reported that she was doing well, taking her medications as prescribed, and had no concerns. (R. 467).

The claimant visited Whatley Health Services on December 22, 2014, complaining of back pain. The claimant reported to Dr. Toya Burton that her back pain began twenty-eight years ago and was worsening. She stated that her pain was in her lower back and radiated to her right leg. After a review of the claimant's systems and a physical exam, Dr. Burton scheduled the claimant for massage therapy and chiropractic manipulation. (R. 926-29).

The claimant visited the emergency room at DCH on February 3, 2015, complaining of pain and swelling in her left arm. The claimant reported to Dr. Carson Penkava that four days

prior to her visit she reached to pick up a glass of water and felt shooting pain in her arm and had since felt intermittent pain and noticed swelling in the arm. The claimant reported that she broke her left arm twelve years ago and had experienced intermittent pain since that time. A physical exam showed no significant joint swelling or warmth and no sepsis, but rather symptoms consistent with arthritis. Dr. Penkava referred the claimant to Dr. Kevin Thompson, an orthopedic surgeon, for follow up and gave her prescription medications. (R. 740-46).

The claimant visited Whatley Health Services on February 12, 2015, to follow up on her anemia, swelling, and hypertension. The claimant reported to Dr. Aalia Al Barwani that she had been experiencing swelling for two weeks and had experienced bone pain, chest pain, depression, fatigue, and headache, among other things, related to her anemia. Dr. Al Barwani's physical exam also revealed elbow pain, so Dr. Al Barwani ordered an x-ray of the claimant's elbow that revealed no acute fractures and calcification along the distal anterior margins of the humerus. Dr. Al Barwani recommended that the claimant visit Dr. Toya Burton for chiropractic manipulation. (R. 929-34).

The claimant visited Whatley Health Services again on March 6, 2015, complaining of back pain and arm pain, specifically in her elbow. The claimant stated that she could not go to an orthopedist because "they wanted too much money." The claimant told Dr. Toya Burton that her back pain was located in her lower back and that her pain level was moderate. She said her right elbow began hurting about one month prior. Dr. Burton's physical exam revealed tenderness in the claimant's lower back and arm pain with motion. A review of the claimant's x-ray from February 13, 2015 showed calcification of distal anterior margins of the humerus. Dr. Burton ordered an MRI of the claimant's upper body. (R. 824-28).

On March 9, 2015, the claimant underwent the MRI of her upper body ordered by Dr. Burton on March 6, 2015. The MRI revealed mild joint effusion, mild joint space narrowing, a small amount of edema, and a potential strain or tear in her left elbow. (R. 893-94).

The claimant visited Whatley Health Services again on March 23, 2015, complaining of back pain, neck pain, shoulder pain, and left arm pain. The claimant told Dr. Toya Burton that her left arm had been hurting constantly and that her neck, back, and shoulder pain were moderate. After a physical exam, Dr. Burton scheduled the claimant for massage therapy, electric stimulation, and chiropractic manipulation. (R. 829-32).

On April 2, 2015, the claimant visited Whatley Health Services for a follow-up of hypertension, wrist pain, and swelling. The claimant reported swelling and pain in her elbow and pain in her wrist beginning two months prior. Dr. Aalia Al Barwani recommended the claimant follow up with her chiropractor and noted that she would refer the claimant to an orthopedic surgeon. (R. 833-36).

The claimant visited Whatley Health Services again on May 5, 2015, complaining of back pain. After performing massage therapy, electric stimulation, and chiropractic manipulation, Dr. Toya Burton recommended the claimant follow up in four weeks. (R. 837-40).

On May 15, 2015, the claimant visited Whatley Health Services complaining of shortness of breath and hot flashes. Dr. Kimberly Forte ordered chest x-rays and a Doppler echo exam that found no abnormalities. Dr. Forte prescribed Prozac for the claimant's menopausal symptoms and instructed the claimant to seek medical attention if she experiences depression or thoughts of suicide. (R. 841-44, 889-92).

The claimant visited Whatley Health Services again on June 1, 2015, for a visit with her chiropractor. The claimant told Dr. Toya Burton that the previous treatments she received had

good results and "lasted a good while." Dr. Burton performed massage therapy and chiropractic manipulation and recommended the claimant follow up in two weeks. (R. 845-48).

The claimant returned to Whatley Health Services on August 5, 2015, to follow up on her hypertension. Dr. Aalia Al Barwani reviewed the claimant's systems and conducted a physical exam that revealed no abnormalities. Dr. Al Barwani recommended that the claimant exercise, change her diet, and visit the emergency room for any chest pain or shortness of breath. (R. 849-52).

On October 16, 2015, the claimant visited Dr. Toya Burton at Whatley Health Services for back pain. The claimant rated her pain as a six on a ten-point pain scale. The claimant reported that chiropractic manipulation relived her symptoms for about three days following an appointment. Dr. Burton scheduled the claimant for massage therapy to treat her back pain. (R. 858-61).

The claimant visited Whatley Health Services on November 5, 2015, for a follow-up on her joint pain and hypertension. Dr. Aalia Al Barwani noted that the claimant rated her joint pain as a seven on a ten-point pain scale. The claimant stated that she had an appointment in January of 2016 to review her disc degeneration, but Dr. Al Barwani recommended that the claimant try and get her appointment scheduled sooner. Dr. Al Barwani referred the claimant to Surgical Associates. (R. 871-76).

The claimant visited Dr. Andrew Barranco at the Kirklin Clinic at UAB on January 12, 2016, complaining of arm and back pain. The claimant stated that her arm pain was the result of a fall in 1997, after which the claimant has experienced occasional swelling and a weakened grip. The claimant also reported chronic back pain since her first pregnancy twenty-seven years prior. The claimant stated that the worst pain is in her lower back and that her pain scale is

typically a seven on a ten-point pain scale, but can be as low as a four and as high as a ten. Dr. Barranco ordered an MRI and x-rays and requested that the claimant follow up in two weeks. (R. 901-05).

On January 26, 2016, the claimant visited Dr. Laura Kezar at Spain Rehab Center for a follow-up evaluation of her back pain and elbow pain. Dr. Kezar ordered a variety of imaging tests, including x-rays and an MRI, labs, and physical therapy for claimant. (R. 896-900).[1]

The claimant sought treatment for back pain at Whatley Health Services on February 1, 2016. The claimant told Dr. Toya Burton that she had received x-rays at UAB, but had been offered no new treatment. Dr. Burton performed chiropractic manipulation and massage therapy. (R. 920-24).

On February 4, 2016, the claimant visited Whatley Health services to follow up on her hypertension and leg pain. The claimant told Dr. Aalia Al Barwani that her back pain occurs constantly and was worsening. She rated her pain as an eight on a ten-point pain scale. Dr. Al Barwani ordered lab tests to be performed and recommended that the claimant follow up in three months. (R. 915-19).

The claimant visited Whatley Health Services again on February 26, 2016, complaining of back pain. The claimant reported that her pain medicine was not helping and made her sleep. Dr. Toya Burton performed chiropractic manipulation and massage therapy and instructed claimant to follow up in three weeks. (R. 906-10).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability insurance benefits and supplemental security income, the claimant requested and received a hearing before an ALJ

---

[1] The claimant testified at her hearing that she did not return for these imaging tests because she had not yet "had the chance" to reapply for Charity Care services.

on March 2, 2016. At the hearing, the claimant testified that she has not worked anywhere since January 19, 2009. When questioned why she could no longer work a full time job, the claimant stated that she suffers from severe headaches, hypertension, and arthritis. (R. 30, 32-33).

Regarding her back pain, the claimant testified that her pain comes and goes, and that she typically has two good days out of a seven-day period. The claimant said that on her good days, she can dress her upper body, but needs help putting on her socks. She also stated that she has to lie down from time to time because of her back pain. The claimant then testified that on her bad days, she requires help getting to the bathroom and getting from the chair to the bed. She stated that she can stand up on the bad days, but cannot "straighten up." On bad days, the claimant said she cannot tie her shoes, get in and out of the bathtub without assistance, or do simple things like sweeping, mopping, and cleaning. The claimant further testified that when she takes her medicine every four hours, it causes her to be drowsy and sleep for "about an hour and a half, two hours." (R. 42-45).

The claimant then testified that her back pain causes numbness in her right leg. She stated that her chiropractor, Dr. Toya Burton, referred her to Spain Rehab and that doctors there determined that her pain was the result of arthritis. The claimant stated that Dr. Burton disagreed with the doctors at Spain Rehab. The claimant testified that she did not return to Spain Rehab because she could not afford another visit and needed to redo her application to the UAB Charity Care program. (R. 46-47).

As to her fibroid tumors, the claimant testified that her tumors cause her to spot "constantly;" that she experiences pain as a result of these tumors; that her pain is an eight on a ten-point pain scale; and that she had not had the tumors surgically removed "due to no insurance." (R. 44).

The claimant also testified that she suffers from high blood pressure and that the medication she takes to control her hypertension causes her to use the restroom "like every 20 minutes" because of its diuretic and affects her eyesight. (R. 46).

The claimant stated that she had been hospitalized several times since her alleged onset date of March 22, 2014. The claimant said that she visited DCH in April of 2014 for chest pains and that doctors performed an x-ray, but did not find anything "definite." The claimant then stated that she returned twenty-four days later with continued chest pains and received another x-ray, which revealed calcifications and minor pleural thickening. The claimant testified that when she returned to her primary care physician, her physician was not able to determine causation because the claimant did not "have insurance to do further testing." The claimant said that she returned to DCH in July of 2014 for diarrhea and C. Diff colitis and spent three days in the hospital. The claimant then returned to DCH in August still complaining of diarrhea. She testified that doctors told her they had not given her enough antibiotics and medication and gave her blood due to chronic anemia. (R. 48-52).

The claimant stated that she returned to DCH in September of 2014 for chest pains and received a left heart catheterization, but doctors were not able to get "to the bottom of why" she was having chest pain. The claimant said that she visited DCH again in February of 2015 for elbow pain because her elbow was swollen and she could not use her arm. Her chiropractor sent her for x-rays which showed that her arm was still broken and this break caused the swelling. The claimant stated that she was also referred to Spain Rehab, where doctors determined her elbow pain was because of arthritis, but again stated that Dr. Burton disagreed with this assessment. The claimant then mentioned that she visited DCH again after February 2015 for diarrhea. (R. 52-54).

A vocational expert, Ms. Marissa Howell, testified concerning the type and availability of jobs that the claimant could perform. Ms. Howell stated that the claimant's past work consisted of a certified nurse assistant, classified as semiskilled work, and an automobile or vehicle processor, classified as unskilled work. (R. 54).

During the administrative hearing, the ALJ proposed a hypothetical scenario to Ms. Howell that supposed an individual with an impairment that required additional unscheduled breaks outside of the normal midmorning, lunch, and midafternoon breaks. Ms. Howell testified that the hypothetical individual would be allowed to take ten minute breaks every hour, but anything above that would not be tolerated for continued employment. The ALJ then asked about an individual who would need additional unscheduled days off throughout the month because they are unable to initiate or sustain a regular work day. Ms. Howell responded that anything above two missed days per month would not be tolerated for continued employment. (R. 54-55).

Ms. Howell also testified that an individual who could only perform light work could not perform the claimant's past work. She also stated that, if an individual was off task about 10% of the time, that individual could work in competitive employment in an unskilled work setting. (R. 55-56).

Ms. Howell then testified that the skills required for CNA work did not transfer to light or sedentary work and certified that her testimony was consistent with the Dictionary of Occupational Titles and her opinions based on her 20 years of experiences as a vocational rehab counselor. (R. 56).

*The ALJ Decision*

On July 19, 2016, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. First, the ALJ found that the claimant met the insured status

requirements of the Social Security Act through December 31, 2015 and had not engaged in substantial gainful activity since the alleged onset date of March 11, 2014. (R. 12).

Next, the ALJ found that the claimant had the severe impairments of mild degenerative disc disease of the cervical spine, mild degenerative disc disease of the lumbar spine, scoliosis, essential hypertension, obesity, fibroid tumors, degenerative join disease of the left elbow, anemia, history of epistaxis, and history of bradycardia. (R. 12).

The ALJ next determined that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 13).

The ALJ noted that the evidence related to claimant's degenerative joint disease of the left elbow failed to show the presence of a gross anatomical deformity *and* chronic join pain and stiffness *with* signs of limitation of motion, *and* findings of an abnormality on appropriate imaging. (R. 13-14).

The ALJ also found that the evidence related to claimant's scoliosis and degenerative disc disease of the lumbar and cervical spine failed to show nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication. (R. 14).

Regarding claimant's hypertension, the ALJ found that the medical evidence of the record failed to establish that the claimant's benign hypertension caused any severe impairment on any other body systems. The ALJ noted that the medical evidence showed that claimant's hypertension was well-controlled with medication and no significant symptoms had ever been documented or reported. As a result, the ALJ found that claimant's hypertension did not satisfy the criteria for any of the cardiovascular listings. (R. 14).

As to the claimant's anemia, the ALJ noted that, although the evidentiary record showed that the claimant had been diagnosed with anemia, the record contained no evidence of the requirements for the listing. (R. 15).

The ALJ also found that the claimant's bradycardia did not meet a listing because the record contained no evidence of "recurrent" arrhythmias resulting in uncontrolled episodes of cardiac syncope or near syncope, despite prescribed treatment. The ALJ noted that the evidentiary record instead indicates that the claimant's few instances of bradycardia completely resolved on their own without receiving any actual treatment; multiple EKGs were normal in nature; and the claimant's left heart catheterization results were interpreted as normal. (R. 15).

Finally, the ALJ accounted for the claimant's obesity in the residual functional capacity determination and found that a reduction to medium exertional work was warranted. (R. 15).

Next, the ALJ determined that the claimant has the residual functional capacity to perform the full range of medium work as defined in 20 C.F.R. 404.1567(a) and 416.967(a). (R. 15). In making this finding, the ALJ considered the claimant's symptoms and the extent to which these symptoms were reasonably consistent with the objective medical evidence and other evidence. The ALJ found that, while the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the claimant's statements concerning the intensity, persistence, and limiting effects of her symptoms are not entirely consistent with the medical evidence and other evidence in the record. (R. 16)

The ALJ found that the medical evidence revealed that the claimant had not experienced a nosebleed since December 1, 2013, when she underwent a nasal cauterization procedure. The ALJ noted that the claimant's nosebleeds do not occur on a daily basis as alleged. Likewise, the ALJ found that claimant had not experience any significant issues with her anemia and had not

been treated for essential hypertension since her alleged onset date. Rather, the ALJ noted that the treatment records from Dr. McDonald, Dr. Holley, Dr. Al Barwani, Dr. Kezar, and records from DCH show that claimant's hypertension is well-controlled with nothing more than routine medications. (R. 17).

Regarding the claimant's bradycardia, the ALJ found that the evidentiary record shows that the claimant's few instances of bradycardia completely resolved on their own without receiving any actual treatment and that multiple EKGs were normal. The ALJ also found that the evidentiary records fail to show that claimant's other impairments of degenerative joint disease of the left elbow, obesity, fibroid tumors, scoliosis, and mild degenerative disc disease of the cervical and lumbar spine, when considered singularly and in combination, would preclude all work-related activities. (R. 17).

The ALJ noted that the claimant presented to the emergency room and her chiropractor multiple times for treatment of back pain, but imaging tests revealed only mild scoliosis and mild to moderate disc bulging, and physical examinations during chiropractic visits were essentially normal. During follow-up visits with her primary care physician, the evidentiary record indicates that the claimant's medications helped to control her back pain and that her physical examinations were unremarkable. The ALJ also noted that claimant's records from visits to the emergency room show her physical examinations were largely normal and did not show that claimant was in acute distress. (R. 18-19).

After reviewing and discussing the evidentiary record in its entirety, the ALJ found that the claimant's medically determinable impairments do cause her to experience work-related limitations, but found no evidence that these limitations reduce her residual functional capacity to anything less than the medium level of exertion. The ALJ found that the claimant's testimony

and other allegations of pain and functional restrictions were not consistent with the objective medical evidence. The ALJ found that the record does not contain objective findings that could reasonably be expected to produce the degree and intensity of pain and limitation alleged by the claimant and no diagnostic studies showed abnormalities that could be expected to produce such severe symptoms. The ALJ also noted that the claimant was not in obvious pain or discomfort while testifying during her hearing, and gave this fact some slight weight in reaching his conclusion regarding the credibility of the claimant's allegations and residual functional capacity. (R. 20).

The ALJ noted that Dr. Williams, the state agency medical consultant who reviewed the medical record in July 2014, determined that the claimant did not have a medically-determinable mental health impairment. Although the evidentiary record contains a diagnosis of depression from an acceptable medical source, Dr. Williams found no evidence of any mental impairments and therefore no mental limitations in the claimant's ability to perform basic work activities. The ALJ gave Dr. William's assessment great weight. (R. 13, 21).

The ALJ found that the records of Drs. Al Barwani, Kezar, Forte, Singh, Holley, McDonald, and Loftin were useful in determining the full scope of claimant's impairments, although none of these physicians offered an opinion concerning claimant's functional limitations. (R. 21).

The ALJ gave little weight to the findings of chiropractor Toya Burton, having considered her findings as an "other medical source." The ALJ gave little weight to Dr. Burton's findings because they were not consistent with the diagnostic imaging reports within the record or consistent with the objective evidence from any acceptable medical source. (R. 21).

Finally, the ALJ found that the claimant was capable of performing past relevant work as a certified nursing assistant and automobile processor. Considering the claimant's residual functional capacity and the physical and mental demands of this work, the ALJ found that the claimant is able to perform these medium-exertion jobs as she actually performed them in the past and as they are generally performed in the national economy. Therefore, the ALJ concluded that the claimant was not disabled as defined in the Social Security Act. (R. 21).

## VI. DISCUSSION

### *Issue 1: The ALJ's Application of the Pain Standard*

The claimant argues that the ALJ did not properly apply the Eleventh Circuit pain standard. More precisely, the claimant argues that the ALJ incorrectly discredited the claimant's complaints of pain. (Pl.'s Br. at 10). This court finds that the ALJ properly applied the pain standard and that substantial evidence supports his decision.

In this case, the ALJ noted that the evidence demonstrated that claimant had underlying medical conditions and severe impairments, but found that the objective medical evidence did not show that she was unable to work because of her impairments. The ALJ concluded that the claimant's records did not include indications of severe, disabling impairments that could likely cause her alleged degree of pain. (R. 20).

In discrediting the claimant's subjective complaints, the ALJ articulated specific grounds for doing so. *See Brown,* 921 F.2d at 1236 (finding that the ALJ must explicitly articulate his reasons for discrediting the claimant's subjective testimony of pain). The ALJ found that the claimant's testimony and other allegations of pain and functional restrictions were not consistent with the objective medical evidence. The ALJ noted that the record contained no objective signs and findings that could reasonably be expected to produce the degree and intensity of pain and

limitations that the claimant alleges. For example, as noted in the ALJ's decision section above, an MRI of the claimant's spine revealed only mild to moderate disc bulging and a x-ray of the claimant's lumbar spine revealed only "mild" changes and no acute abnormalities. The ALJ correctly noted that such findings do not support the claimant's allegations of debilitating back pain that reaches a ten on a ten-point pain scale. Additionally, cardiac workups and imaging studies of the claimant's chest have been consistently negative in nature. The ALJ correctly noted that these findings do not support the claimant's assertion that she experiences debilitating chest pain. (R. 20).

Based on the explicit findings of the ALJ, this court concludes that he properly applied the Eleventh Circuit's pain standard and that substantial evidence supports his decision.

### Issue 2: The ALJ's Assessment of the Claimant's RFC

The claimant next argues that the ALJ erred in failing to link the residual functional capacity to the evidence. Specifically, the claimant alleges that no evidentiary basis existed for the ALJ's characterization of the claimant's impairments or his determination of the claimant's ability to perform work. (Pl.'s Br. at 6). This court finds that substantial evidence supports the ALJ's determination of the claimant's RFC.

While the ALJ must assess the claimant's functional limitations and restrictions and then express her functional limitations in terms of exertional levels, the ALJ's decision does not have to reference every specific piece of evidence that the ALJ evaluated, as long as the decision shows that she considered the claimant's medical condition as a whole. *Castel v. Comm'r of Soc. Sec.,* 355 F. App'x 260, 263 (11th Cir. 2009); *Freeman v. Barnhart*, 20 F. App'x 957, 959-60 (11th Cir. 2007).

As discussed above, the ALJ thoroughly reviewed and considered the medical records concerning each of the claimant's impairments to determine the claimant's residual functional capacity. This careful review of the evidence led the ALJ to determine that the claimant had the residual functional capacity to perform the full range of medium work as defined in 20 CFR 404.1567(c) and 416.967(c). (R. 15).

The ALJ also met his burden of proving the claimant could engage in a full range of medium work through vocational expert testimony. *See Chester,* 792 F.2d at 132 (finding that vocational expert testimony is substantial evidence to prove the claimant can perform work despite his impairments). The vocational expert testified that claimant's past work as a CNA and vehicle processor involved medium physical demand levels and that claimant could take breaks and be off-task for 10% of the work day while still being able to engage in competitive employment in an unskilled work setting. (R. 56).

Based on these findings as to the claimant's medical records and the vocational expert's corroborative testimony, this court concludes that substantial evidence supports the ALJ's RFC determination that the claimant could perform medium-exertion work.

*Issue 3: The ALJ Properly Developed the Record Without Obtaining an MSO.*

Finally, the claimant argues that the ALJ should have developed the record by obtaining a medical source opinion ("MSO") either with medical expert assistance or by consultative examination. In particular, the claimant argues that the ALJ needed to develop the record with a consultative examination to "make an informed decision." (Pl.'s Br. at 10). The court finds that the ALJ did not need to obtain an MSO because the record contained sufficient evidence.

In the present case, the evidentiary record contained sufficient evidence for the ALJ to make a determination of disability, so obtaining an MSO was unnecessary. *See Welch,* 854 F.2d

at 440 (noting that developing a full and fair record "may not require the use of expert-testimony"). The claimant provided several years' worth of medical records, including multiple imaging studies and treatment notes from numerous physicians. The ALJ specifically noted that he found these treatment records "useful in determining the full scope of the claimant's impairments." (R. 21)

Requiring the ALJ to obtain an MSO would disregard the ALJ's ability to determine a claimant's RFC based on an already sufficient record. *See Langley*, 777 F. Supp. 2d at 1261 (finding that the regulations do not require the ALJ to base his RFC finding on an assessment from a medical source). Furthermore, the claimant could have presented a MSO from one of her own doctors for the ALJ's consideration, but failed to do so. *See Gibson,* 762 F.2d at 1516 (noting that the claimant bears the burden of proving [s]he is disabled). The ALJ's duty to develop the record does not relieve the claimant of his burden to prove his own disability. Therefore, this court finds that the ALJ properly developed the record.

## VII. CONCLUSION

For the reasons stated above, this court AFFIRMS the decision of the Commissioner. The court will enter a separate Order to that effect simultaneously.

DONE and ORDERED this 15th day of February, 2019.

**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE